Paul G. Gizzi (NYS BAR NO. 2505287)
Email: gizzip@sec.gov
Kristine M. Zaleskas (NYS BAR NO. 2912657)
Email: zaleskask@sec.gov
*Appearing Pursuant to Local Civil Rule 83.3(c)(3)*

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | Case No.: **'26 CV 0361 AJB BJW** |
| **Plaintiff,** | **COMPLAINT** |
| **against** | |
| **BRETT ROSEN, DEBORAH BRAUN, DAVID M. MASSEY, and RB CAPITAL PARTNERS, INC.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against Defendants Brett Rosen ("Rosen"), Deborah Braun ("Braun"), David M. Massey ("Massey"), and RB Capital Partners, Inc. ("RB Capital") (collectively, "Defendants"), alleges as follows:

1

# SUMMARY

1.      From at least January 2021 through at least June 2024 (the "Relevant Period"), Defendants Rosen and RB Capital (together, the "RB Capital Defendants") engaged in a fraudulent scheme in which they used social media to promote the stock of a struggling public company, Solar Integrated Roofing Corporation ("Solar"), while simultaneously making massive, undisclosed sales of their own Solar stock at enormous profits. As part of their fraudulent promotional scheme, the RB Capital Defendants created the false impression that they were acquiring their own Solar stock at prices far higher than what they actually paid for the stock.

2.      During the Relevant Period, the RB Capital Defendants acquired Solar stock by purchasing promissory notes from Solar that were convertible to Solar stock.

3.      The RB Capital Defendants entered into six convertible note agreements (the "Notes"), which purported to allow them to receive Solar stock at certain fixed conversion rates, initially $3 per share and later $4.50 per share.

4.      Contrary to the Notes' stated terms, however, Solar subsequently allowed the RB Capital Defendants to convert the Notes to stock at much lower conversion rates—ranging from 14 cents ($0.14) per share to as little as $0.00005 per share, or half a hundredth of a cent per share.

5.      At the same time that the RB Capital Defendants were acquiring low-priced Solar stock through the Notes conversions, they falsely and misleadingly promoted Solar stock to the public on social media—including by telling the public that Solar was an attractive, long-term investment; and by creating the false impression that they would convert their Notes to Solar stock at the far higher conversion rates stated in the Notes. In fact, directly contrary to their social media posts promoting Solar stock, the RB Capital Defendants converted their Solar stock at the lower prices set forth above and sold them into the open market for enormous profits, without disclosing their massive Solar stock sales to the unsuspecting public.

2

6.    Through their fraudulent scheme, the RB Capital Defendants pocketed millions of dollars in illicit profits, acquiring over 1.6 billion shares of Solar stock at secretly discounted prices—ranging from $0.00005 to $0.14 per share—and then selling over 1.4 billion of these shares to the public at prices ranging from $0.0001 to $2.60 per share.

7.    Defendant Braun, a co-owner of RB Capital, was at all relevant times a control person of RB Capital, and she provided substantial assistance to the RB Capital Defendants in carrying out their fraudulent scheme to promote Solar stock to the public while simultaneously selling it.  For example, Braun tracked the RB Capital Defendants' sales of Solar stock.

8.    Additionally, in February 2023, Defendant Massey, Solar's CEO, engaged in fraudulent conduct regarding Solar–by directing Solar to issue a press release falsely claiming that Solar had secured a $10 million a line of credit with a large national bank to finance Solar's working capital needs (the "Press Release").

9.    In fact, as Massey knew at the time of the Press Release, Solar had not entered into any such credit facility with a financial institution.

10.    The day after Solar issued the Press Release, Solar's stock price rose by 40%, and the volume of Solar shares trading in the market skyrocketed by approximately 500% compared to the prior day's trading volume.

11.    The RB Capital Defendants intended the Press Release to create the impression for investors and potential investors that Solar had been deemed creditworthy by a large bank and had secured capital for its business.

## VIOLATIONS

12.    By virtue of the foregoing conduct and as alleged further herein, RB Capital and Rosen have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

13.    By virtue of the foregoing conduct and as alleged further therein, Braun: (i) is liable as a control person under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for RB Capital's violations of Exchange Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5 thereunder [17 C.F.R. §§ 240.10b-5]; and (ii) aided and abetted RB Capital's and Rosen's violations of Securities Act Section 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240-10b-5(a) and (c)].

14.    By virtue of the foregoing conduct and as alleged further herein, Massey has violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

15.    Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

16.    The SEC brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

17.    The SEC seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Defendants from participating in any offering of a penny stock, pursuant to Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; (e) prohibiting Defendant Massey from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or

that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (f) ordering any other and further relief the Court may deem just and proper.[1]

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

19.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

20.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. For instance, Defendants reside and transact business in this District.

## DEFENDANTS

21.     **Rosen**, age 45, resides in La Jolla, California. Rosen and Braun, who are married, own Defendant RB Capital. Rosen has used the Twitter handle @BrettRosen325.[2]

22.     **Braun**, age 44, resides in La Jolla, California. Braun has been the secretary and co-owner of RB Capital since November 2017.

23.     **Massey**, age 62, resides in Escondido, California. Massey was Solar's CEO from March 2016 until he resigned on May 15, 2023.

24.     **RB Capital** is a California corporation based in La Jolla, California. In

---

[1] The term "penny stock," as used herein, is defined in Exchange Act Rule 3a51-1, and refers generally to a security issued by a very small company that trades at less than $5 per share.

[2] Twitter changed its name to X during the relevant period. This Complaint refers to it as Twitter throughout.

public documents, RB Capital has stated that it "is operated by its two managing partners, Deborah Braun and Brett Rosen" or "is a family-owned business whose sole owners and principals are a husband and wife residing in La Jolla, California."

### RELATED ENTITY

25.     **Solar** is a Nevada corporation with its principal place of business in Henderson, Nevada. It purports to be "an integrated, single-source solutions provider of solar power, roofing systems and EV charging company specializing in commercial and residential properties throughout North America."

26.     Solar had a class of common stock registered under Exchange Act Section 12(g) [15 U.S.C. 78$l$(g)] until April 14, 2023, when it filed a notice of deregistration (on Form 15-12G) with the SEC. Its stock is quoted on OTC Link, an electronic inter-dealer stock quotation system operated by OTC Markets Group Inc., under the ticker "SIRC." In its most recent annual report for the year ended December 31, 2023, filed on the OTC Markets website on April 17, 2024, Solar reported total assets of $21,059,481 and total liabilities of $45,758,221.

27.     In its last disclosure report for the quarter ended September 30, 2024, posted on the OTC Markets website on January 7, 2025, Solar reported total assets of $8,995,339 and total liabilities of $43,034,667.

### FACTS

**I.    Background**

28.     During the Relevant Period, RB Capital was owned, operated, and funded solely by Rosen and Braun.

29.     During the Relevant Period, RB Capital had no employees.

30.     During the Relevant Period, RB Capital described itself in press releases as "a private investment fund" whose "main investment focus . . . is on small and microcap publicly traded companies trading on the OTC Markets, Nasdaq and New York Stock Exchange."

31.     RB Capital stated at times in public press releases that it "predominantly

makes debt investments"; "is known for paying off any harmful convertible debt, giving companies a real chance at success"; and "does NOT manage any outside money, nor does it have any investors" (emphasis in original).

32.    During the Relevant Period, the RB Capital Defendants were in the business of acquiring low-price shares of microcap stock through convertible note agreements and quickly selling the shares into the market.

33.    RB Capital is a multi-million-dollar enterprise, with its sales of Solar stock alone generating gross proceeds of at least $33 million during the Relevant Period.

34.    Braun was generally included on Rosen's communications with the issuers about their investments.

35.    Rosen routinely sent Braun draft documents for her review, including draft funding proposals, draft press releases, and proposed "tweets" for issuers concerning RB Capital's investment in them.

36.    Braun, along with Rosen, received regular transaction summaries from their broker concerning RB Capital's trading, including trades in SIRC.

**II.    The RB Capital Defendants Enter into Multiple Convertible Note Agreements with Solar.**

37.    In January 2021, the RB Capital Defendants approached Solar about a potential investment by RB Capital in Solar.

38.    On January 23, 2021, for example, Rosen emailed Massey "we can get on a call and Deborah and I will answer your questions."

39.    After negotiations with Solar about the investment, on January 24, 2021, Massey emailed Rosen that his attorney had approved the initial financing proposal. Rosen forwarded this email to Braun, who replied, "It's happening. He's so in!"

40.    On January 25, 2021, Braun and Rosen both signed a term sheet outlining RB Capital's funding proposal to Solar.

41.    The term sheet set out the elements of the proposed deal: that RB Capital would "purchase an agreed upon amount of third-party, non-affiliate debt owed by

[Solar] and memorialized in the form of a convertible debenture (*e.g.*, promissory note) and evidenced on the Company's financial statements" but then, "by way of addendum with unanimous board approval, the promissory note conversion price is amended to an agreed upon fixed price."

42. The term sheet further stated, "all subsequent [investment] tranches will be issued in the form of convertible promissory notes with a 5x valuation (or greater) to the current price or a conversion price of roughly $3.00 per share."

43. According to the term sheet, the then-current bid-ask price for Solar stock was $0.59 / $0.60.

44. The term sheet also outlined the plan for additional rounds of investment by RB Capital in exchange for additional convertible promissory notes.

45. Shortly thereafter, RB Capital loaned Solar $1 million in exchange for a convertible note dated February 8, 2021 (the "February 8 Note").

46. The February 8 Note provided RB Capital the right to "convert" the note's principal into shares of Solar.

47. Specifically, the February 8 Note provided for a conversion price of $3 per share—meaning that RB Capital could convert the note and receive shares of Solar stock at $3 per share in return for its $1 million investment plus interest, as described further below.[3]

48. Braun was involved in drafting a planned press release about the February 8 Note. While the press release ultimately was not issued, Braun was an active participant in the discussions about it.

49. On January 29, 2021, shortly after Massey agreed to RB Capital's proposal, Braun emailed him, saying: "Glad we are doing a deal together"; and attaching a sample Solar press release for him to issue to announce RB Capital's investment. When Massey

---

[3] This Complaint refers to strike or exercise prices as "conversion prices."

8

emailed his first draft of this press release to Rosen, Rosen replied, "I just sent it to Deborah. Always include her on all emails."

50.    Additionally, Rosen and Braun both reviewed and edited Solar's anticipated press release concerning RB Capital's funding proposal to Solar and agreed that the press release should "somehow say that our investment into [Solar] is at a fixed conversion price of $3.00."

51.    After Massey further edited the release, Rosen replied, "[a]s long as Deborah signs off, then we are good to release tomorrow!" Braun then emailed Massey with her edits to this proposed release, informing him that "[w]e are good to go with this version."

52.    Shortly after Solar and RB Capital had entered their funding agreement, Rosen, cc:ing Braun, introduced Massey via email to a podcaster who covered OTC and NASDAQ stocks.

53.    After making the February 8 Note investment, the RB Capital Defendants made five additional convertible note investments in Solar, from February 2021 through May 2023 (together with the February 8 Note, the "Notes"). The first four of those Notes included stated conversion prices of $3 per share, and the last two included stated conversion prices of $4.50 per share.

54.    The dates, loan amounts, and stated conversion prices for the last five of the Notes were as follows: (1) February 18, 2021—$3,500,000 loan with a $3.00 conversion price; (2) February 26, 2021—$4,500,000 loan with a $3.00 conversion price; (3) April 22, 2022—$800,000 loan with a $3.00 conversion price; (4) February 16, 2023— $1,000,000 loan with a $4.50 conversion price; and (5) May 1, 2023—$500,000 loan with a $4.50 conversion price.

55.    The following table summarizes the Notes:

| Date of Note | Principal Amount | Conversion Price |
|---|---|---|
| February 8, 2021 | $1,000,000 | $3.00/share |
| February 18, 2021 | $3,500,000 | $3.00/share |
| February 26, 2021 | $4,500,000 | $3.00/share |
| April 22, 2022 | $800,000 | $3.00/share |
| February 16, 2023 | $1,000,000 | $4.50/share |
| May 1, 2023 | $500,000 | $4.50/share |
| **TOTAL** | **$11,300,000** | |

56.    RB Capital wired the principal loan amounts stated in paragraph 54 above from its bank account to Solar's account (the "Wires").

57.    Braun personally ordered at least one of the Wires – for $4,500,000 on February 26, 2021.

58.    RB Capital's total investment through the Notes was $11,300,000.

59.    The Notes included various interest rates, ranging from 5% to 8%.

60.    Interest accrued on the Notes, rather than being paid periodically.

**III.    The RB Capital Defendants Converted Their Notes to Solar Stock at Much Lower Prices Than The Stated Conversion Prices.**

61.    Though the Notes contained stated conversion prices of $3 or $4.50 per share, the RB Capital Defendants actually converted the Notes to Solar stock at much lower conversion prices than those stated in the Notes.

62.    The RB Capital Defendants converted the Notes to Solar stock by directing Massey and Solar to lower the conversion price.

63.    While serving as Solar's CEO and sole director, Massey accommodated each of the RB Capital Defendants' directions to lower the Notes' conversion prices by executing written consents that approved addenda to the Notes. These addenda lowered the conversion prices to fractions of the original prices.

64.    In reducing the conversion prices, Massey acted solely at Rosen's direction

10

and without corporate justification.

65.    After receiving the necessary documentation from Massey to exercise the notes at the lower price, Rosen submitted the paperwork to Solar's transfer agent to effectuate the conversion.

66.    Braun was regularly included on email communications between the RB Capital Defendants and Solar's transfer agent, including regarding conversion of the Notes' conversion prices.

67.    Following Massey's resignation in May 2023, Solar management continued to enable the RB Capital Defendants to convert the remaining Notes balances to Solar stock at prices far below the Notes' stated conversion prices.

68.    By directing Solar to lower the Notes' conversion prices, the RB Capital Defendants were able to obtain a vast number of Solar shares at extremely low prices.

69.    Defendants thus converted the Notes and acquired Solar shares at prices ranging from 14 cents per share ($0.14) to $0.00005 per share, significantly less than the Notes' stated $3 or $4.50 conversion prices.

70.    Using the Notes, the average conversion price that the RB Capital Defendants paid for their Solar stock was $0.0045 per share (less than half a penny per share)—one-thousandth of the Notes' higher stated conversion price of $4.50.

71.    In addition to the six Notes, Defendants purchased aged debt from an existing Solar creditor (the "Aged Debt").

72.    On February 3, 2021, Defendants converted the Aged Debt into Solar shares.

73.    The terms of the original Aged Debt agreement, which applied to the RB Capital Defendants' investment, set the stock conversion price at a 25% discount of Solar stock's closing price on the date of conversion.

74.    Solar stock closed at $1.495 per share on February 3, 2021.

75.    Therefore, as of February 3, 2021, the Aged Debt's stated conversion price was $1.12 per share.

76.    In fact, Solar allowed Defendants to convert the Aged Debt as of February 3,

2021 at a tiny fraction of the Aged Debt's stated conversion price: the RB Capital Defendants converted it at $0.001 per share, or a mere tenth of a cent per share.

77.    By converting the Aged Debt at $0.001 per share, Defendants acquired 13.8 million shares of Solar stock.

78.    Between February 2021 and May 2024, by converting the Aged Debt and the Notes, Defendants acquired a total of approximately 1,662,162,142 shares of Solar.

79.    The conversion dates, number of shares converted, identification of the relevant note, and conversion price for each of Defendant's conversions of Solar stock from February 2021 through May 2024, are listed in Appendix A to this Complaint, which is incorporated herein by reference.

80.    Rosen deposited the Solar shares that he converted from the Notes and Aged Debt into brokerage accounts in the name, or for the benefit, of RB Capital.

**IV.    Rosen Promoted Solar as a Good Investment While Selling Over a Billion Solar Shares.**

81.    During the Relevant Period, Rosen actively promoted microcap stocks on social media, including through his Twitter account.

82.    During the Relevant Period, Rosen used the handle @BrettRosen325 on Twitter.

83.    During the Relevant Period, Rosen's Twitter biography sought to downplay his efforts to promote various microcap stocks.

84.    Specifically, at least during the Relevant Period, Rosen's Twitter biography contained the following statement: "I am the owner of RB Capital Partners, Inc. and I mainly invest in small/micro cap public companies. My posts are NOT financial or trading advice."

85.    Contrary to Rosen's Twitter biography, many of his social media tweets during the Relevant Period touted various microcap stocks, describing them as good investment opportunities for his followers.

86.    In addition, Rosen's tweets during the Relevant Period held himself out as

an active, experienced, and careful investor.

87.    From February 2021 through at least March 2024, Rosen tweeted about Solar stock on dozens of occasions.

88.    Throughout the Relevant Period, Braun was aware of Rosen's tweets because he "tagged" her account @deborahrachelb, and Braun occasionally publicly retweeted his tweets touting stocks RB Capital owned.

89.    During the Relevant Period, Rosen's tweets frequently touted Solar stock as a good investment.

90.    Rosen's Solar-related tweets generally promoted Solar as a valuable company with a bright future. For example, on March 1, 2021, Rosen tweeted (tagging Braun): "$sirc is disrupting the #solar & #EV markets with their new acquisitions, #EV charging stations and uplist in the very near term! @solarintegrated @elonmusk $tsla @deborahrachelb #evcharging".

91.    Rosen's tweets also promoted Solar as a good long-term investment opportunity. For example, on May 31, 2021, Rosen tweeted (again tagging Braun): "$sirc is a sleeping giant with nasdaq style revenue and growth trajectory! Acquisitions like crazy adding to their bottom line everyday! $sirc @SIRCStock @deborahrachelb #SOLAR #EV".

92.    In his promotional tweets, Rosen also frequently included Solar on what he described as a list of several good investment opportunities.

93.    At the same time that Rosen was promoting Solar and encouraging others to invest in it, the RB Capital Defendants were converting the Notes and Aged Notes at a fraction of the stated conversion prices and selling those shares for significant profits.

94.    Several of Rosen's tweets falsely indicated that he was not selling Solar stock when, in fact, he was simultaneously, or virtually simultaneously, selling it.

95.    For example, on February 21, 2021, Rosen tweeted: "I invest millions in companies of my own money and stay in them for years!  $opti $sbfm $jetr $iswh $pctl $sirc $psyc $gtxo. Just to name a few!"

96.    The next day, February 22, 2021, the RB Capital Defendants sold at least 470,000 Solar shares for over $752,000—an average price of about $1.60 per share, much more than the $0.001 per share at which Defendants had obtained Solar stock through their conversions.

97.    As further described in paragraph 90 above, on March 1, 2021, Rosen tweeted about Solar's "new acquisitions" and indicated that he believed Solar would "uplist in the very near term!"

98.    On the same day, March 1, 2021, the RB Capital Defendants sold at least 350,000 Solar shares for approximately $406,000—an average price of approximately $1.16 per share.

99.    The next day, on March 2, 2021, Rosen tweeted: "It looks like $sirc is in for a nice little gap up this morning! I am expecting big movement in this stock over the next week or so! $sirc #EV #solar #uplist".

100.    Later on March 2, 2021, Rosen tweeted the following: "$sirc can easily make its way to $2+ in the short term."

101.    The same day, March 2, 2021, Defendants sold at least 325,000 Solar shares for approximately $415,000—an average price of approximately $1.28 per share.

102.    On August 23, 2022, Rosen tweeted, tagging Braun, "$SIRC won't be a small cap for long!" and "Good morning! It looks like $SIRC is going to gap up nicely this morning on the news of their $66m in revenue for Q2!" meaning that Solar's market capitalization, or the total market value of all its outstanding shares of stock, would soon grow significantly given its $66 million in revenue for the second quarter of 2022.

103.    The same day, August 23, 2022, Rosen and RB Capital sold at least 1,793,993 Solar shares for approximately $760,000—an average price of approximately $0.42 per share.

104.    On August 24, 2022, when Solar stock was trading well below $1 per share, Rosen tweeted (with emphasis added in bold but capitalization in original):

I can assure you that I want nothing more than for $SIRC to go back

to \$3+ and I will NOT do anything to stand in the way!...#**RBCapital will NOT be dumping any shares into the open market!** Our goal is to reduce the debt and help \$SIRC uplist to the #Nasdaq

105.   That same day, August 24, 2022, Rosen and RB Capital sold at least 115,000 shares for approximately \$42,000—an average price of approximately \$0.37 per share.

106.   On August 25, 2022, Rosen tweeted: "I am still very bullish on \$SIRC and I am having breakfast this morning at my [sic] with [Solar CEO] Dave Massey and I will update as much as [I] can!"

107.   The same day, August 25, 2022, Rosen and RB Capital sold at least 1,318,598 shares for approximately \$385,000—an average price of approximately \$0.29 per share.

108.   On September 21, 2023, Rosen tweeted: "\$SIRC – I had a long call with management yesterday and I am very impressed with their go-forward plan. I expect to see @SIRCStock cash flow positive in the next 3 months!"

109.   The next day, September 22, 2023, Rosen and RB Capital sold at least 3,982,180 shares for approximately \$22,000—an average price of approximately \$0.006 per share.

110.   On December 25, 2023, Rosen tweeted: "I hope Everyone has a wonderful holiday and let's make 2024 an incredible year of success and profits!"  Rosen then tweeted several stock tickers, including Solar's ticker SIRC.

111.   From December 26 to 29, 2023, Rosen and RB Capital sold at least 33,500,000 shares for approximately \$31,000—an average price of approximately \$0.0009 per share.

112.   On February 10, 2024, Rosen tweeted:

The actual business of \$SIRC is going better than ever. . . . The problem is the 3(a)(10) [referring to a statutory mechanism whereby certain securities may be sold in the market without having to meet

15

the usual registration requirements] which is dragging the share price down on a weekly basis! I do believe that once the selling is over, $SIRC will rebound very nicely!

113.    From February 12 to 26, 2024, Rosen and RB Capital sold at least 7,549,499 shares for approximately $49,000—an average price of approximately $0.007 per share.

114.    On March 14, 2024, after Solar hired a new CEO, Rosen tweeted:

I believe in $SIRC and I don't feel the stock price is in any way reflective of the true value of the company. I expect that [Solar CEO] Brad [Rinehart] will post $30m+ in revenue this fiscal year so once the debt is gone, this thing can fly again! I just think we are a long way from the debt being cleared!

115.    From March 14 to 22, 2024, Rosen and RB Capital sold at least 110 million Solar shares for approximately $51,000—an average price of $0.0005 per share.

116.    In total, from February 2021 through June 2024, the RB Capital Defendants sold at least 1.4 billion shares of Solar stock, more than 80% of the approximately 1.6 billion Solar shares they had acquired through their stock conversions.

117.    The RB Capital Defendants had acquired the Solar stock that they sold at an average price of $0.0045 and sold those shares at an average price of $0.02.

118.    From their sales of Solar stock during the Relevant Period, the RB Capital Defendants obtained gross proceeds of over $33 million and total illicit profits of over $26 million.

119.    The RB Capital Defendants did not publicly disclose any of their Solar stock sales; nor were they otherwise publicly disclosed.

120.    During the Relevant Period, at the same time that he was promoting Solar stock on social media, Rosen understood that it was illegal for him to encourage his Twitter followers to purchase Solar shares without disclosing that he was selling them.

121.    In June 2023, Rosen was recorded acknowledging that his practice of "[t]elling people you're not selling the stock when you're selling it – that is a way to get

banned for life."

122.   As part of the fraudulent scheme, and through Rosen's effective control of Massey, the RB Capital Defendants knew or recklessly disregarded that Solar, as a public company, would need to publicly disclose the existence of the Notes and their stated conversion rates.

123.   In its periodic reports published on the OTC Markets website during the Relevant Period, Solar publicly disclosed the existence of the Notes, including the $3 or $4.50 conversion price.

124.   In addition, on at least several occasions from February 2022 to March 2023, Rosen tweeted about the Notes on his Twitter account, including specifically their $3 or $4.50 conversion price.

125.   Rosen's tweets were false and misleading because he failed to say that he was simultaneously selling Solar stock.

126.   For example, on February 17, 2022, Rosen tweeted the following about the Solar Notes:

> I don't 'collect' the interest as in most cases it just accrues and then also converts into $SIRC [Solar] common stock @ the $3/share conversion price!  I will most likely hold the debt until @SIRCStock decides to pay it off in cash or uplist to the #NASDAQ. #RBCapital

127.   On August 24, 2022, Rosen tweeted the following about the Solar Notes:

> @illBuythatfora1 @xDCCBx @ggORgoldengod @SIRCStock My $SIRC issuances are in the filing that just came out! There was an addendum made (not a default provision) to the $1m note that altered the conversion price to $0.14! #RBCapital has also provided considerable additional funding to help with cash flow!
>
> …
>
> I can assure you that I want nothing more than for $SIRC to go back to $3+ and I will not do anything to stand in the way!...#**RBCapital**

17

**will NOT be dumping any shares into the open market.** Our goal is to reduce the debt and help $SIRC uplist to the #Nasdaq

128.  On February 9, 2023, Rosen tweeted the following about the Solar Notes: @LewisBobert @Helios70605396 @twsmith2824 @SIRCStock Please don't put words in my mouth. I lost millions in value on my shares as evidenced by the conversion prices in the filings! I also lost more than $2.25m on the LOC that hasn't been paid in months! Not to mention 8% on $2m is only $160,000 so it hardly helps even I had…

129.  On March 13, 2023, Rosen tweeted the following about the Solar Notes: @SpacTrader110 @SIRCStock I posted a picture of the promissory note showing the $4.50 conversion price. Th [sic] note you are referring to was restructured and $1.75m+ of debt was settled! $SIRC also has an option to buy back those shares as they were to serve as collateral against the $2m LOC!

130.  Braun knew of, and substantially participated in, the RB Capital Defendants' fraudulent scheme to promote Solar stock while simultaneously profiting by selling the stock.

131.  For example, during the Relevant Period, Braun reviewed a draft press release and edited RB Capital's funding proposal to Solar, directed RB Capital's bank account to wire funds to Solar, maintained schedules of the Solar convertible notes, and tracked the RB Capital Defendants' sales of Solar stock.

132.  When providing substantial assistance to the RB Capital Defendants, Braun was aware that Rosen was touting Solar stock on social media as a good long-term investment while at the same time they were both secretly selling large amounts of the RB Capital Defendants' Solar stock.

133.  At least one of Rosen's Twitter followers who purchased Solar stock during the Relevant Period lost money on their Solar investments.

**V.    Rosen, Braun, and RB Capital Engaged in Similar Conduct Involving At**

**Least One Additional Stock.**

134.   In addition to Solar, the RB Capital Defendants engaged in similar false and misleading public touting and simultaneous stock sales involving at least one other stock.

135.   Specifically, the RB Capital Defendants' fraudulent scheme also involved OTC stock BlockQuarry Corp. ("BlockQuarry"), formerly known as ISW Holdings Inc.

136.   From early 2021 through at least 2023, the RB Capital Defendants, among other things, acquired BlockQuarry shares through convertible notes, promoted the stock to induce investors to buy shares, and at or about the same time, secretly sold their own BlockQuarry stock at a profit.

## VI.    Solar's Fraudulent Press Release

### A. Massey Directed Solar to Issue a False Press Release.

137.   In February 2023, while Massey was Solar's CEO and sole director, Solar was a struggling microcap issuer, and its stock was thinly traded.

138.   On its website, Solar claimed to be "an integrated, single-source solutions provider of solar power, roofing systems and EV charging company specializing in commercial and residential properties throughout North America."

139.   After the close of trading on February 6, 2023, Solar, at Massey's direction, issued the Press Release, entitled "[Solar] Secures $10 million Revolving Credit Facility with Top Four National Bank."

140.   The Press Release claimed that Solar had "secured a new $10 million revolving credit facility with a top four national bank to finance the Company's working capital requirements, subject to customary closing conditions."

141.   The Press Release included quotes from Massey and identified him as Solar's CEO and Chairman.

142.   The Press Release quoted Massey as saying that the purported credit facility would help grow Solar: "[T]his new credit facility will provide greater financial flexibility to invest in internal initiatives and support our next phase of growth."

143.   The Press Release further quoted Massey as follows: "The terms of the new

facility are favorable to SIRC and enhances [sic] our borrowing capacity at attractive rates, reflecting our strong base of business and cost control efforts to reduce redundant expenses."

144.   The Press Release was false because, at the time Solar issued it, Solar had not entered into a credit facility with any bank or financial institution, much less "a top four national bank."

145.   At the time Solar issued the Press Release, and as alleged further below, Massey knew that Solar had not entered into a credit facility with any bank or financial institution, much less "a top four national bank."

146.   Massey issued the false Press Release due to Solar's need for additional funding.

147.   Specifically, as alleged further below, after issuing the press release, Massey and Rosen sought to secure funding for Solar from a potential investor.

148.   On February 6, 2023, Solar's stock traded at a price of $0.0598 per share at the market's close, with an intraday high price of $0.0616 per share.

149.   Solar issued the Press Release after the close of trading that day.

150.   On February 7, 2023, the next day, Solar stock traded at a price of $0.06 per share when the market opened.

151.   Over the course of the day, Solar's stock hit a high price of $0.084 per share, an approximate 40% increase in Solar's share price over the closing price on February 6, and an approximate 36% increase in Solar's intraday high price on February 6.

152.   Solar's trading volume also skyrocketed on February 7, 2023.

153.   The number of Solar shares traded increased from around 8 million shares on February 6 to more than 47 million shares on February 7—an approximate 500%

increase in Solar's trading volume.[4]

**B. Massey and Rosen Subsequently Attempted to Arrange Financing.**

154.   After Solar falsely announced the existence of a credit facility in the Press Release, Massey and Rosen attempted to secure such financing but were unable to do so.

155.   On approximately February 9, 2023—three days after Solar had issued the Press Release at Massey's direction—Rosen made an initial pitch about Solar as an investment opportunity to an individual ("Individual A"), whom Rosen understood was someone who reviewed potential investments for an investor client.

156.   Rosen had previously represented to Individual A that he had himself invested about $15 million in Solar.

157.   In fact, Rosen had only invested approximately $11.3 million in Solar.

158.   Rosen suggested to Individual A that Solar might be a good investment opportunity for one of Individual A's clients.

159.   Shortly after his initial pitch on February 9, 2023 Rosen set up a further pitch meeting with Individual A.

160.   On multiple occasions after February 9, 2023, Rosen, Braun and Massey met with Individual A.

161.   During these meetings, Massey and Rosen pitched Individual A about having his client make a $10.5 million loan to Solar.

162.   Massey and Rosen pitched a proposed $10.5 million loan that would supposedly work as follows: (i) Solar would deposit the $10.5 million loan proceeds in its operating account but would not spend any of the money for operations or otherwise; and (ii) Solar would instead use the $10.5 million loan proceeds to "collateralize" a credit facility that Solar was purportedly negotiating with a large, well-known financial

---

[4]   After the press release was issued and Solar's stock price increased, the RB Capital Defendants sold 1,250,000 shares of Solar for gross sales proceeds of approximately $87,000.

institution (the "Financial Institution").

163.    Massey and Rosen spent several weeks in or about February and March 2023 attempting to persuade Individual A to get his client to loan $10.5 million to Solar.

164.    In addition to his desire for financing for Solar, Massey believed that Solar would benefit from any profits that Rosen derived from his securities trading or other involvement with Solar.

165.    In or about February 2023, while Massey and Rosen were pitching Individual A on a loan to Solar, Individual A asked Massey for confirmation that Solar was committed to pursuing the deal with the Financial Institution.

166.    In response, Massey made statements showing that he knew that the Press Release was false when issued.

167.    In a recorded telephone call, Massey also told Individual A that he did not want Solar to have to issue a corrected press release: "Well, we already announced that we got approval, so I'd hate to go back."

168.    While Massey and Rosen were trying to convince Individual A to have his client make the $10.5 million loan to Solar, Rosen emphasized to Individual A the value of Solar being able to announce a credit facility with a major bank like the Financial Institution.

169.    In a recorded telephone call in early March 2023, Rosen stated to Individual A: "Solar is an OTC company…it's pretty much unheard of that [the Financial Institution] gives loans to pink sheet companies. I've never seen it ever, in my entire career…. I think the impact of [the Financial Institution] being the lender, rather than, like, you know, Tony Baggadonuts…the impact that it will have on the stock will be enormous."

170.    When he resigned in May 2023, Massey still had not secured the type of funding Solar had announced in the Press Release.

171.    Since Massey's departure, Solar has still not secured such a credit facility.

172.    While he remained CEO, Massey failed to retract or correct the false Press

Release.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (Rosen and RB Capital)

173.   The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 172.

174.   Defendants Rosen and RB Capital, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

175.   By reason of the foregoing, Defendants Rosen and RB Capital, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Rosen and RB Capital)

176.   The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 172.

177.   Defendants Rosen and RB Capital, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices,

schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

178.   By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
**Control Person Liability for Violations of
Exchange Act Section 10(b) and Rules 10b-5
(Braun)**

179.   The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 172.

180.   As alleged above, RB Capital violated Exchange Act Section 10(b) and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

181.   At all relevant times, Braun controlled RB Capital and was a culpable participant in RB Capital's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

182.   By reason of the foregoing, Braun is liable as a controlling person pursuant to Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for RB Capital's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5 thereunder [17 C.F.R. § 240.10b-5)].

### FOURTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of
Securities Act Section 17(a)(1) and (3)
(Braun)**

183.   The SEC re-alleges and incorporates by reference here the allegations in

paragraphs 1 through 172.

184.    As alleged above, Rosen and RB Capital violated Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)].

185.    Braun knowingly or recklessly provided substantial assistance to Rosen and RB Capital with respect to their violations of Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §§ 77q(a)(1) and (3)].

186.    By virtue of the foregoing Braun is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Rosen's and RB Capital's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and, unless enjoined, will continue to aid and abet these violations.

### FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of
### Exchange Act Section 10(b) and Rules 10b-5(a) and (c) Thereunder
### (Braun)

187.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 172.

188.    As alleged above, Rosen and RB Capital violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

189.    Braun knowingly or recklessly provided substantial assistance to Rosen and RB Capital with respect to their violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

190.    By virtue of the foregoing, Braun is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Rosen's and RB Capital's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)] and, unless enjoined, will again aid and abet these violations.

## SIXTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5(b) Thereunder (Massey)

191.   The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 36, 137 through 172.

192.   Defendant Massey, directly or indirectly, singly or in concert, in connection with the purchase and sale of securities and by use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly and recklessly has made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading,

193.   By reason of the foregoing, Defendant Massey, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendants Rosen, Braun, and RB Capital and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Permanently enjoining Defendant Massey and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)];

### III.

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

### IV.

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

### V.

Permanently prohibiting Defendants from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)];

### VI.

Permanently prohibiting Massey from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78*l*] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

### VII.

Granting any other and further relief this Court may deem just and proper.

# JURY DEMAND

The SEC demands a trial by a jury.

Dated:  January 21, 2026

Respectfully submitted,

*/s/ Paul G. Gizzi*

_____
Paul G. Gizzi (gizzip@sec.gov)
Kristine M. Zaleskas (zaleskask@sec.gov)
*Appearing Pursuant to Local Civil Rule 83.3(c)(3)*

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
212-336-1100

28